D. S. Leick v. Commissioner. Gladys (Leick) Furie v. Commissioner.
D. S. Leick v. Commissioner
Docket Nos. 111631 and 111632.
United States Tax Court
1948 Tax Ct. Memo LEXIS 265; 7 T.C.M. (CCH) 18; T.C.M. (RIA) 48006; January 27, 1948
James A. Brown, Esq., and A. Wm. Morris, C.P.A., for the petitioners. T. M. Mather, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: The respondent determined deficiencies in income tax for the calendar year 1939 in the amount of $3,698.09 against each of the petitioners. The sole questions presented are whether the respondent correctly determined the amount of income realized by petitioners as a result of the transfer in 1939 of a part of the assets of a partnership to a newly organized corporation, and whether any gain realized is taxable as ordinary income or capital gain. Findings of Fact During the year 1939, petitioners were husband and wife and filed their returns for that year on a community property basis with the *266 collector of internal revenue at Tacoma, Washington. In 1932, D. S. Leick and E. W. Moen formed a partnership. Its business consisted of the highway transportation of gasoline and the wholesale and retail distribution of gasoline and petroleum products in the county of Spokane, Washington. The partnership acquired a string of service stations which it owned and leased. From 1932 to 1938 it handled the wholesale distribution of products of the Continental Oil Company in and around the city of Spokane under a contract with that company. In the fall of 1938 the partnership severed its connection with Continental, and for approximately one year handled products of the Richfield Oil Company. Its services to Richfield consisted of transporting Richfield products from Seattle to the Spokane bulk plant of Richfield, and distributing these products from this plant on its city trucks to local service stations. On August 31, 1939, the members of the partnership entered into an agreement with Inland Empire Refineries, Inc. (hereinafter referred to as Inland). Inland had constructed a refinery in Spokane but had no appreciable established business in that community at that time. Under the *267 terms of the agreement Moen and Leick were to organize a corporation to be known as Moen-Leick Industries, Inc., and transfer to the newly organized corporation the following assets: Reserve for
Assets
Depreciation
Acquired
Transferred
9-30-39
White truck (#1) 1929 8- 5-38
$ 700.00
$ 272.30
International - (#2) 1934
12- 1-33
1,450.00
1,450.00
Ford (#4) 1937 8- 5-38
700.00
204.12
International (#6) 1933 4- 1-36
325.00
325.00
Service Station Equipment
Various
23,758.50
6,847.62
Buildings
Various
29,194.72
3,295.53
Land
Various
5,330.90
Lease Improvements
Various
6,074.85
1,978.04
Vera Service Station 9-25-39
5,511.10
Building - 38th & Grand 9-25-39
1,177.21
International Truck - 1935 8- 1-39
502.25
Totals
$74,724.53
$14,372.61
Less Reserve for Depreciation
$14,372.61
Net value of fixed assets
$60,351.92 *
Contracts receivable
7,025.77
Total
$67,377.69
Less Liabilities assumed by corporation
21,119.86
Balance
$46,257.83
Cash
5,000.00
Total assets transferred to corporation
$51,257.83 **
*268 The agreement stated that it was expressly understood and agreed that there are no assets to be transferred by first parties to said corporation other than those specifically described in said agreement and no liabilities or encumbrances except as set forth therein. The agreement also provided that the new corporation was to have an authorized capital of $200,000, represented by 2,000 shares of stock having a par value of $100 per share, of which $160,000 was to be paid in. Under the terms of the agreement all of the 1,600 shares to be issued, with the exception of 50 which Inland was to receive upon delivery to the new corporation of $5,000 worth of gasoline, were to be delivered to Moen and Leick in consideration for the transfer heretofore mentioned, and they agreed that they would deposit 750 of such shares, issued in the name of Inland as owner and endorsed by Inland in blank, in escrow at the Spokane and Eastern Branch of the Seattle First National Bank of Spokane upon the payment to them of $20,000 by Inland, $15,000 in cash and $5,000 in gasoline. The agreement provided that Inland should pay to Moen and Leick a further sum of $55,000 for the 750 shares "at the rate of *269 at least one-half cent per gallon on each and every gallon sold by the corporation to be organized * * * through its service stations and in no event less than the sum of Six Thousand ($6,000.00) Dollars per year payable in monthly installments of not less than Five Hundred ($500.00) Dollars per month * * *". The new corporation was duly incorporated on September 3, 1939, and on September 8, 1939, it entered into an agreement with Moen and Leick wherein the latter agreed to operate and manage its business, give their exclusive time and attention thereto, and to engage in no other business than the businesses in which they were then engaged or that would be in any wise competitive with the business of the new corporation, so long as they were the owners of fifty per cent of its stock. In consideration for these services the agreement provided that Moen and Leick were to be paid three fourths of a cent per gallon on each and every gallon of Inland Empire Refineries, Inc., gasoline sold by the new corporation through its own owned and operated retail gasoline service stations, and on each and every gallon of Inland Empire Refineries, Inc., gasoline sold to retail service stations served *270 by it. The agreement of August 31, 1939, was carried out in accordance with its terms, and the transfer of assets in exchange for stock was made as of September 30, 1939 774 of the new corporation's shares were issued to Leick and one to his wife, 774 shares to Moen and one to his wife, and 50 shares to Inland. On the same day, Moen and Leick each assigned 375 shares to Inland in consideration of its promise to pay them $75,000 therefor, and pursuant to the agreement these shares were deposited in escrow. The stock of the new corporation was not listed on any stock exchange. Its fair market value on September 30, 1939, was $100 per share. After this transaction was consummated, the partnership of Moen and Leick continued to engage in the highway transportation of gasoline using in connection therewith that part of the partnership assets not transferred to the new corporation. In January 1940, Moen sold 200 shares of his Moen-Leick Industries stock to Leick and 200 shares to Inland at an agreed price of $75 per share. The agreement of September 8, 1939, was then cancelled and a new agreement entered into between Leick and the new corporation wherein it agreed to pay him as compensation *271 nine sixteenths of a cent per gallon in lieu of the amount provided for in the prior agreement. Leick paid $7,100 under the contract to purchase 200 shares from Moen, and then abandoned the purchase. Inland paid the balance due and acquired the stock. The respondent determined that each of the petitioners should have reported income from the transaction in the amount of $25,935.54, or $22,283.39 in excess of the amount they included in their returns, and explained his determination as follows: "(a) It has been held that the transfer of certain assets of the partnership of Moen & Leick Industries to Moen-Leick Industries, Inc. constituted a taxable exchange resulting in taxable income as follows: Consideration received: 800 shares capital stock of Moen-
Leick Industries, Inc.
$ 80,000.00
Cash or other property received
or to be received from Inland
Empire Refineries, Inc.
75,000.00
Total
$155,000.00
Less net basis of assets sold
51,257.83
Taxable profit
$103,742.17
One-half to each partner
51,871.08
Community one-half
25,935.54
Less amount reported on return
3,652.15
Addition to taxable income
$ 22,283.39"
Opinion The parties are in apparent *272 agreement that the net basis of the assets transferred to the new corporation in exchange for stock was $51,257.83. They disagree as to the amount of income realized and as to whether this income should be treated as ordinary income or capital gain. We will first consider the fair market value of the stock received, the determination of which will permit the computation of the amount of gain realized. The respondent contends that the stock had a value of $100 per share on the date the transaction was consummated, while petitioners contend that its value on that date was $35.16 per share. The value urged by petitioners is based upon the book value (cost less depreciation) of the assets transferred by the partnership to the new corporation. Where a corporation issues all of its shares for property, their value is oftimes measured by the value of the property where it is the only available measure of cost. Pierce Oil Corporation, et al., 32 B.T.A. 403, 430. Book value does not usually reflect actual value, and in the absence of evidence that it does, it is entitled to but little weight in determining the value of a corporation's stock. Petitioners have made no attempt *273 to prove the actual value of the assets transferred to the new corporation, and it is quite possible that some of them, such as land and buildings, materially increased in value between the time of their acquisition and their transfer to the new corporation. Fortunately we are not compelled to resort to book value in determining the value of the stock at the time of its receipt by petitioners, as the evidence discloses that on the same day they received this stock they sold 750 shares to Inland for $75,000, and in January 1940, four months later, Moen sold 200 shares to Leick and 200 to Inland for $75 per share. Being of the opinion that the best evidence of the fair market value of the new corporation's stock on the basic date is the price paid by Inland on that date for 750 shares rather than the price at which it was sold several months later, we have found as a fact that the fair market value of the stock at the time of its receipt by petitioners was $100 per share. The remaining question is whether the gain realized by the petitioners should be taxed as ordinary income or capital gain. Petitioners contend that $72,377.69 of the amount realized by the partnership was paid for *274 tangible assets transferred to the new corporation and that the remainder was paid for intangible assets. In urging that the entire gain on the transaction was attributable to the sale of intangibles - the gasoline outlets which were so necessary to the operation of the new industry, the Inland Empire Refineries - they seek to have the entire gain treated as having been realized from the sale of a capital asset, intangible and non-depreciable property, and taxed as a long-term capital gain, subject to the fifty per cent limitation provided for in section 117 (b), I.R.C.
It may not be amiss to point out at the outset that petitioners are not contending that they sold an interest in the partnership, and on brief they say: "Moen and Leick, co-partners, did not sell to the Moen-Leick Industries, the new corporation, a going business; they did not turn over their partnership business to this corporation; they retained everything that was in the co-partnership save and except specific assets set out in Exhibit 1, together with the sum of $5,000.00 in cash, * * *." Even if it be assumed that the petitioners were correct in their contention that they sold property *275 consisting in part of tangible and in part of intangible assets, we would be at a loss to make an allocation between them because, as heretofore pointed out, petitioners have only proven the book value of the tangible assets transferred. How much should be allocated to them as their actual value, in the event that an allocation was necessary, would not be possible of determination from the record. But we do not deem it necessary to base our conclusion on this issue on this failure of proof, as the evidence does not support the petitioners' contention that tangible and intangible assets were transferred to the new corporation for 1,500 shares of its stock. The contract of August 31, 1939, is in evidence and it specifically lists the assets which were to be transferred to the new corporation for stock, and states that it is "expressly understood and agreed that there are no assets to be transferred by first parties to said corporation other than those specifically described." The assets listed are set forth in our findings and no mention of any intangible asset such as good will is contained therein. At or about the time the new corporation acquired the above-mentioned assets pursuant *276 to the contract of August 31, 1939, it also acquired the exclusive services of Moen and Leick pursuant to the contract of September 8, 1939. If its intention was to pay any amount for intangibles such as good will, such an amount might conceivably have been taken into consideration in fixing the compensation for services of three-fourths of a cent per gallon of gasoline sold. However, any conclusion on our part that any amount was paid for such an intangible would be based on pure conjecture. The contract of August 31, 1939, compels the conclusion that the assets mentioned therein, and those assets only, were transferred to the new corporation for 1,550 shares of stock and the assumption of liabilities amounting to $21,119.86. "Partners may by agreement make any disposition of the firm assets that an individual can make of his property." Stringer v. Stevenson, 240 Fed. 892. Any part of the gain attributable to the sale of "capital assets" [1] is taxable to the extent provided in section 117 (b), I.R.C., and the remainder is taxable as ordinary income. Cf. Williams v. McGowan, 152 Fed. (2d) 570. The major part of the assets transferred *277 were depreciable assets specifically excepted from the definition of "capital assets" in section 117 (a) (1), I.R.C., shown in the margin. [1] The record is silent as to what part of the gain, if any, is attributable to non-depreciable assets. The burden was on the petitioners to overcome the prima facie correctness of the respondent's determination that the entire gain was taxable as ordinary income, and in the absence of evidence that some part of the gain was realized from the sale of capital assets, we must decide in favor of the respondent. *278 Decision will be entered for the respondent. Footnotes
*. This amount represents the cost of fixed assets less depreciation. ↩
**. The highway transportation equipment owned by the partnership was retained by it and was not included in the assets transferred.↩
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1) * * *.↩